# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 18-54V
### Filed: March 27, 2020
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * *
                                         *
KARIN MARTINDALE,                        *
                                         *
            Petitioner,                  *      Findings of Fact; Onset;
                                         *      Shoulder Injury Related to Vaccine
     v.                                  *      Administration ("SIRVA").
                                         *
SECRETARY OF HEALTH                      *
AND HUMAN SERVICES,                      *
                                         *
            Respondent.                  *
                                         *
* * * * * * * * * * * * * * * * * * * * * *
```

*Shealene Mancuso, Muller Brazil, LLP, Dresher, PA, for Petitioner.*
*Lynn Schlie, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ONSET[1]

**Oler**, Special Master:

On January 10, 2018, Karin Martindale ("Ms. Martindale" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program").   The petition alleges that the influenza ("flu")

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

vaccination Ms. Martindale received on August 5, 2016 caused her to suffer from Shoulder Injury Related to Vaccine Administration ("SIRVA").  Pet. at 1.

During the pendency of this matter, Petitioner submitted one affidavit and two supplemental affidavits that she authored, an affidavit prepared by her mother, as well as other documentary evidence.

I held a hearing via VTC on January 28, 2020 in Washington, DC, to determine the date of onset of Petitioner's shoulder pain.  Ms. Shealene Mancuso appeared on behalf of Petitioner and Ms. Lynn Schlie appeared on behalf of Respondent.  I heard testimony from Petitioner and her mother.

After carefully considering the testimony of the witnesses, the medical records, affidavits, and documentary evidence, I find that Petitioner's left shoulder pain began the day of her vaccination.

## I.   Procedural History

On January 10, 2018, Petitioner filed a petition alleging that she suffered from SIRVA as a result of a flu vaccine administered on August 5, 2016.  Pet., ECF No. 1.  Petitioner filed medical records on January 10, 2018.  Exs. 4, 5, 6, 7.  She filed additional medical records on January 9, 2019 (Exs. 10, 11), and February 13, 2019 (Ex. 12).  On March 26, 2019, Petitioner filed a supplemental affidavit.  Ex. 13.

On May 16, 2019, Respondent filed a Rule 4(c) Report.  ECF No. 23.  Respondent stated that Petitioner had not demonstrated that she suffered from a SIRVA Table claim, had not provided evidence satisfying her burden of proof under *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005), and further, had not demonstrated onset of symptoms close-in-time to her vaccination.  Resp't's Rep. at 7-8.

I conducted a status conference on May 30, 2019.  After the status conference, I asked that Petitioner file a supplemental affidavit explaining why she did not mention shoulder pain during her August 12, 2016 medical appointment.  *See* Scheduling Order on 5/30/2019, ECF No. 24.  Both parties indicated that an onset hearing would be helpful in resolving the case.  *Id.*

Petitioner filed additional medical records on June 19, 2019 (Ex. 14), and June 27, 2019 (Ex. 15).  On June 27, 2019, Petitioner filed an affidavit from Annette Certain (Ex. 16) and a supplemental affidavit from Petitioner (Ex. 17).  On January 14, 2020, Petitioner filed additional medical records.  Ex. 21.

I conducted a fact hearing via VTC on January 28, 2020 in Washington, DC.  After the hearing, and in accordance with my scheduling order, Petitioner filed additional medical records on February 14, 2020 (Exs. 22, 23, 24), March 3, 2020 (Exs. 25, 26, 27), and March 5, 2020 (Ex. 28).  On March 5, 2020, Petitioner filed a status report indicating that she was still waiting to receive medical records from Baptist South Jacksonville and Care Spot and that she anticipated she would file those records in the next 30 days.  ECF No. 40.  Petitioner filed those additional

records on March 20, 2020.  Exs. 29, 30.  She filed a statement of completion on that same day.
ECF No. 43.  This matter is now ripe for adjudication.

## II.      Petitioner's Medical Records that Pertain to the Issue of Onset

Petitioner was born in 1985.  She was 31 years old on August 5, 2016, when she received
the allegedly causal flu vaccination in her left deltoid at the CVS Minute Clinic in Jacksonville,
Florida.  Ex. 1 at 3.  Prior to her vaccination, Petitioner did not have a history of left shoulder pain.

While she visited the Minute Clinic for her flu shot, Petitioner also received a tuberculin
("TB") skin test.  Ex. 1 at 3.  Petitioner was directed to return to the Minute Clinic 48-72 hours
later to receive the results.  *Id.* at 5.

On August 12, 2016, Petitioner presented to the Guide Well Health & Wellness Center in
Jacksonville, Florida.  Ex. 7 at 8.  The purpose of the visit is listed as an annual physical.  *Id.*  The
record mentions that Petitioner just had a flu shot on August 5, 2016.  *Id.*  Under "Current Meds"
the record indicates that Petitioner was taking several medications, including "Motrin IB 200 MG
Oral Tablet; TAKE 1 TABLET 4 TIMES DAILY; RPT".  *Id.* at 9.  The musculoskeletal section
of the record states, "MS: No joint pain/swelling or musculoskeletal deformities".  *Id.*  The record
from this visit does not indicate that Petitioner mentioned left shoulder pain.

On November 10, 2016, Petitioner visited Bahri Orthopedics & Sports Medicine Clinic
with a complaint of left shoulder pain.  Ex. 5 at 1.  Specifically, this record states, "The onset of
the shoulder pain has been sudden following an incident not at work (Patient stated that pain started
after she was given a flu shot and has been occurring in a persistent pattern for 3 months (8-5-16)."
*Id.*

Petitioner began PT on November 16, 2016.  Ex. 3 at 13.  She was discharged from PT on
December 15, 2016, after completing 12 sessions.  *Id.* at 40-41.

Petitioner returned to Bahri Orthopedics complaining of persistent shoulder pain that did
not improve after PT.  Ex. 2 at 6.  She visited CORA Rehabilitation Clinics on January 31, 2017.
Ex. 3 at 46.  The history section of that visit notes, "Patient reports that she received a flu shot
back in August 2016 and has had pain in her shoulder since."  *Id.*

Petitioner was discharged from the second round of PT on March 23, 2017.  She attended
18 visits.  Ex. 3 at 42-43.  On April 21, 2017, Petitioner visited Southeast Orthopedic Specialists.
Ex. 4 at 2.  The "History of Present Illness" Section states that Petitioner presented with left
shoulder pain "that began after she received her first flu shot back in August of 2016."  *Id.*  Dr.
Esser's clinical assessment included "post injection subdeltoid bursitis".  *Id.*

## III.     The Petition, Affidavits, and Documentary Evidence

The Petition filed in this matter states that Petitioner experienced a SIRVA following her
August 5, 2016 flu vaccination.  Pet. at 1-3.

### A. Affidavits

#### 1. Affidavit of Petitioner

In her initial affidavit, Petitioner stated that she experienced pain in her left shoulder immediately following her August 5, 2016 vaccination. Ex. 8.

#### 2. Petitioner's Second Affidavit

Petitioner signed her second affidavit on March 26, 2019. Ex. 13. In that document, she stated that she had never received a flu vaccine before. *Id.* at 1. Petitioner stated that she went to the CVS Minute Clinic to receive the vaccine. *Id.* According to Petitioner, the nurse who administered the vaccine placed the needle high on her shoulder. *Id.* Petitioner indicated the shot burned as it was injected. *Id.* Petitioner stated that she felt pain immediately following vaccination. *Id.*

The next day, Petitioner had to drive three hours to attend her grandfather's funeral. Ex. 13 at 1. Her arm ached and was sore at the injection site. *Id.* She also developed a bruise that she had to hide with make-up. *Id.* at 1-2.

Petitioner stated that she was busy with work and school, and with raising her twin boys. Ex. 13 at 2. As a result, she did not go to the doctor until November. *Id.* During the time between her vaccination and her medical appointment in November, Petitioner used ibuprofen, ice, and heat to ease her shoulder pain. *Id.* By the time she made her medical appointment in November, Petitioner was unable to pick up her twin boys due to her shoulder pain. *Id.*

#### 3. Petitioner's Third Affidavit

Petitioner signed her third affidavit on June 27, 2019 in response to my request that she explain why she did not mention shoulder pain at her August 12, 2016 medical appointment. Ex. 17.

In this document, Petitioner stated that this appointment was scheduled so her doctor could sign the forms she needed to submit in order to attend school. Ex. 17 at 1. According to Petitioner, "she may have done a minor exam, such as vitals and weight check, but the main reason for the visit was [for] her to just sign the form." *Id.* Petitioner stated that she told her doctor about her shoulder pain, but because it was only one week after vaccination, her doctor thought it was normal pain from the shot. *Id.*

#### 4. Affidavit of Ms. Annette Certain

Ms. Annette Certain, Petitioner's mother, signed her affidavit on June 22, 2019. Ex. 16. Ms. Certain stated that Petitioner never had any left shoulder or arm pain prior to her August 5, 2016 vaccination. *Id.* at 1. Ms. Certain stated that Petitioner called her the day she received her flu vaccination. *Id.* Petitioner said she had received her flu shot that day and was experiencing

pain. *Id.* Ms. Certain recalls this date because they were planning on attending her father-in-law's (Petitioner's grandfather's) funeral on August 6, 2016. *Id.*

Ms. Certain saw Petitioner the next day at the funeral in Inverness, Florida. Ex. 16 at 1. She stated that Petitioner was wearing a sleeveless dress and had a bruise the size of a quarter where the shot had been administered. *Id.* Petitioner complained to Ms. Certain about how much her shoulder hurt during the drive to Inverness. *Id.* After the funeral, Ms. Certain observed that Petitioner could not lift her twin two-year-old boys like she normally could. *Id.*

In the following months, Ms. Certain spoke with Petitioner about one time per week. Ex. 16 at 2. During these phone calls, Petitioner continued to complain about her shoulder pain. *Id.* After several weeks, Ms. Certain recommended that Petitioner see a doctor. *Id.* Petitioner was busy and hoped that the pain would go away on its own. *Id.*

In October of 2016, Ms. Certain went to visit Petitioner to celebrate Halloween. Ex. 16 at 2. Ms. Certain noticed that Petitioner was still experiencing shoulder pain. *Id.* Ms. Certain encouraged her to visit a doctor. *Id.* Petitioner scheduled an appointment in November 2016. *Id.*

### B. Documentary Evidence

Petitioner filed her grandfather's obituary, indicating that the funeral was on August 6, 2016. Ex. 18. She also filed bank records demonstrating she used her bank card in Inverness, Florida on August 6, 2016. Exs. 19, 20.

### C. Testimony at the Hearing

#### 1. Testimony of Petitioner

Petitioner testified that before her vaccination, she had never injured her shoulder. Tr. at 7-8. On August 5, 2016, Petitioner received her flu vaccination in her left shoulder at CVS Minute Clinic. *Id.* at 8. She received the flu shot, along with a TB test because she was starting a college program that involved hospital clinicals. *Id.* This was the first flu shot she had ever received. *Id.* The nurse gave her the shot when Petitioner was sitting and she (the nurse) was standing. *Id.* at 9. The nurse injected her at the top of her left shoulder approximately one half an inch to one inch below the shoulder joint bone. *Id.* Petitioner testified that she experienced pinching and burning as she received the shot. *Id.* at 10. By the afternoon that same day, Petitioner could feel the soreness in her shoulder. *Id.* at 11.

That evening, Petitioner called her mother. Tr. at 12. She told her mom that she had received a flu shot that day and that it was feeling "really sore." *Id.* at 13. Her mom told her the pain was normal. *Id.*

The next day, on August 6, 2016, Petitioner traveled to Inverness, Florida for her grandfather's funeral. Tr. at 13. The drive was about three hours, and Petitioner experienced pain when she tried to hold both hands on the steering wheel. *Id.* at 13-14. During the family gathering

after the funeral, Petitioner had a hard time picking up her two-year-old twin boys. *Id.* at 15. The drive back home was also painful for Petitioner. *Id.* at 16.

Petitioner discussed some of her medical appointments. Specifically, she testified that when she returned to CVS for her TB check, she did not mention the shoulder pain she was experiencing. Tr. at 17. She explained that this visit was just to check the TB result, and there was no other discussion that took place. *Id.* Petitioner also stated that she thought the soreness was normal. *Id.* at 18.

Petitioner testified that during her August 12, 2016 medical appointment, she did mention she was experiencing pain after her flu shot. Tr. at 18-19. The provider told her the pain was normal. *Id.* at 19. Petitioner mentioned that she was taking 200 milligrams of Motrin four times per day. *Id.* at 43. She was taking this medication because of her shoulder pain. *Id.* At no point did the provider perform a physical exam or test the range of motion in her shoulder. *Id.* at 20.

Petitioner testified that she waited three months to seek treatment (from this August appointment until November) because she initially thought the pain was normal, and then because she was busy. Tr. at 21.

## 2. <u>Testimony of Annette Certain</u>

Ms. Certain is Petitioner's mother. Tr. at 53. She and Petitioner typically speak on the phone one time each week and see each other once every three or four months. *Id.* Ms. Certain testified that Petitioner received her flu vaccine on August 5, 2016. *Id.* at 54. She is confident about that date because they traveled to her father-in-law's funeral the next day. *Id.*

Ms. Certain spoke with Petitioner on the phone the day Petitioner received her flu shot. Tr. at 54. Petitioner told her that her arm was sore after the shot. *Id.* at 55. Ms. Certain told Petitioner that the pain was probably normal. *Id.*

Ms. Certain saw Petitioner at the funeral the next day. Tr. at 57. Petitioner was wearing a sleeveless dress and Ms. Certain saw a bruise on her shoulder that was about the size of a quarter. *Id.* Petitioner told Ms. Certain that she was experiencing a lot of pain. *Id.* As a result of this pain, Ms. Certain had to help Petitioner with the boys during the funeral and at the family gathering. *Id.* at 58.

After the funeral, Ms. Certain next saw Petitioner in October 2016, around the time of Halloween. Tr. at 63. At this time, Petitioner was still having trouble lifting the boys and performing her daily tasks. *Id.* Because of these continued issues, Petitioner made an appointment with her doctor. *Id.* at 65.

## IV.   Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing her claim by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in

favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are presumed to be accurate and complete. *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992)(citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")). "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs.*, 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate. *Campbell*, 69 Fed. Cl. at 779 ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a

rational determination. *Burns by Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

## V.    Findings of Fact

The issue to be addressed is when Petitioner's symptoms of left shoulder pain began. Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a preponderance of the evidence. § 300aa-12(a)(1)(A).  Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence."  *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring).  In light of the witness testimony, medical records, affidavits, and other documentary evidence presented in this case, and after my careful examination of the record as a whole, I find there is preponderant evidence that the onset of Petitioner's symptoms of left shoulder pain began on August 5, 2016, the day of vaccination.

In her affidavits and during her testimony at the hearing, Petitioner attests that she experienced pain the same day that she received her flu vaccination.  I find her testimony on this point to be credible, and further find this testimony is corroborated by her medical records, and by the affidavit and testimony of Ms. Certain.

The medical records from August 12, 2016, (seven days after vaccination) do not indicate that Petitioner mentioned shoulder pain to her provider.  However, at hearing, Petitioner testified that she told her provider she experienced shoulder pain after her flu shot, and that she was taking Motrin for her pain. Tr. at 18-19, 43.  The records corroborate this testimony in that they indicate Petitioner was taking several medications, including "Motrin IB 200 MG Oral Tablet; TAKE 1 TABLET 4 TIMES DAILY; RPT".  Ex. 7 at 9.

In addition, Petitioner's subsequent medical records directly attribute her shoulder pain to her flu vaccination.  On November 10, 2016, Petitioner visited Bahri Orthopedics & Sports Medicine Clinic with a complaint of left shoulder pain. Ex. 5 at 1.  Specifically, this record states, "The onset of the shoulder pain has been sudden following an incident not at work (Patient stated that pain started after she was given a flu shot and has been occurring in a persistent pattern for 3 months (8-5-16)."  *Id.*  Additionally, when Petitioner visited CORA Rehabilitation Clinics on January 31, 2017, the history section of that visit notes, "Patient reports that she received a flu shot back in August 2016 and has had pain in her shoulder since." Ex. 3 at 46.  Finally, on April 21, 2017, when Petitioner visited Southeast Orthopedic Specialists, the "History of Present Illness" section states that Petitioner presented with left shoulder pain "that began after she received her first flu shot back in August of 2016."  Ex. 4 at 2.  These records establish by preponderant evidence that Petitioner experienced left shoulder pain on August 5, 2016, the day of vaccination.

## VI.    Conclusion

I find that the affidavits submitted by and on behalf of Petitioner, the testimony, the medical records, and the other documentary evidence work in concert to provide preponderant evidence that Petitioner's left shoulder pain began on August 5, 2016.

The following is therefore ORDERED:

By no later than **Monday, May 25, 2020**, Petitioner and Respondent shall file a joint status report updating me on their proposed next steps in the case based on the facts articulated in this ruling.

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master